## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LILIAN T.[1],
     *Plaintiff*,

    v.

KILOLO KIJAKAZI,
     *Defendant*.

No. 3:22-cv-00642 (VAB)

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Lilian T. has filed an administrative appeal under 42 U.S.C. §§ 405(g) and 1383(c)(3) against Kilolo Kijakazi, the Commissioner of Social Security ("Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA") denying her claim for Title II Disability Insurance Benefits ("DIB") under the Social Security Act. Lilian T. has moved to reverse the Commissioner's decision or, in the alternative, to remand the case for a new hearing, while the Commissioner has moved to affirm its decision.

For the reasons explained below, Lilian T.'s motion is **GRANTED**. The Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

---

[1] In opinions issued in cases filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial in order to protect the privacy interests of social security litigants while maintaining public access to judicial records. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

A.   Factual Background

Born in December 1986, Lilian T. has suffered from inflammatory arthritis for nearly a

decade. Pl.'s Mem. in Support of Pl.'s Mot. for Order Reversing the Decision of the Comm'r or

in the Alt. Mot. for Remand for a Hrg., ECF No. 12-1, at 1, 3 ("Pl. Mem."). On her date last

insured (DLI), December 31, 2014, she had just turned forty-six years old. *Id.* at 3; Certified

Administrative Record, ECF No. 8, at 19 ("Tr."). Lilian T. previously worked as a packing

supervisor, which is a "skilled, light exertion job," according to the Dictionary of Occupational

Titles (DOT) 920.132-010. Pl. Mem. at 3. She also briefly worked as a nanny in 2013–14. *Id.* at

4. In December 2013, she obtained a certificate in medical office work, although she never

obtained a job in that field. *Id.* at 3–4; Tr. at 18.

Administrative Law Judge I. K. Harrington ("the ALJ" or "ALJ Harrington") found that

Lilian T. had two medically determinable impairments: rheumatoid arthritis and obesity. Tr. at

18. The ALJ found, however, that while Lilian T.'s conditions could have reasonably been

expected to produce the alleged symptoms, her statements concerning their intensity, persistence,

and limiting effects were "not entirely consistent" with the rest of the record. Tr. at 20. ALJ

Harrington therefore concluded that Lilian T. did not have an impairment or combination of

impairments that significantly limited her ability to perform basic work activities. *Id.* at 21.

1.      **Medical History**

Lilian T. has provided medical records dating back 2009. *Id.* at 349–70.

On July 14, 2009, she saw her doctor for her rheumatoid arthritis, complaining of

"[m]orning stiffness for 1 hour" and pain in her right wrist and left ankle. *Id.* at 353. At this

point, Lilian T. was already taking methotrexate, an immunosuppressive drug used to treat

rheumatoid arthritis. *Id.* Because methotrexate was not fully managing her symptoms, the doctor discussed with Lilian T. the possibility of going on Enbrel, another drug used to treat rheumatoid arthritis, and she agreed to try it. *Id.* at 355. The doctor observed tenderness and moderate swelling of her right index finger, middle finger, and wrist. *Id.* These symptoms continued for the next several months; Lilian T. reported several hours of morning stiffness each day and pain in her neck and right hand at her appointment on December 15, 2009. *Id.* at 349. The doctor continued to observe similar swelling of Lilian T.'s fingers and wrist. *Id.* at 350.

On August 4, 2009, Lilian T.'s hands were x-rayed and the doctor discovered "a mild decrease of bone mineralization" on her left hand, but "[n]o specific osseous joint or soft tissue abnormality[.]" *Id.* at 369. Her right hand was found to have "mild narrowing of the fifth metacarpophalangeal joint" but no other specific arthritic changes. *Id.* at 370.

Between 2010 and 2011, Lilian T.'s condition appeared to improve and respond to medication. On February 22, 2010, Dr. Karp reported that Lilian T.'s joints were "much better" than at the last appointment, although her right wrist and hand was swollen. *Id.* at 346. On January 3, 2011, Lilian T. reported that she was "[f]eeling good" and that she had not had any joint pain or swelling until she ran out of her medication. *Id.* at 341. The doctor observed some swelling of her right and left wrists and fingers. *Id.* at 342. On September 29, 2011, Lilian T. enrolled in a clinical trial for Cimzia. *Id.* at 440.

However, on September 11, 2012, Lilian T.'s symptoms had recurred. She reported more than four hours of morning stiffness each day, bilateral hand and foot pain, and difficulty raising her left arm due to shoulder pain. *Id.* at 545. Dr. Dumitrescu found Lilian T.'s fingers to be deformed and tender, and also noted that her shoulders were tender and moved abnormally. *Id.* at 546. The doctor did not note any swelling or tenderness of her wrists or hands. *Id.*

On September 21, 2012, Dr. Dumitrescu assessed that Lilian T. had four conditions: rheumatoid arthritis, compression arthralgia of multiple sites, myalgia, and myositis. *Id.* She noted that Lilian T. had stopped participating in the Cimzia trial because she taken several trips to Peru. *Id.* at 539. On the same day, Lilian T. completed a functional ability questionnaire. *Id.* at 537. She indicated that she experienced a lot of difficulty sleeping through the night and some difficulty performing daily tasks, such as dressing herself, turning faucets on and off, getting in and out of cars, trains, and buses, walking for multiple kilometers, and participating in recreational activities. *Id.* She stated that she was able to get in and out of bed, use a cup, walk on flat ground, bathe, and bend down to pick something up from the floor with no difficulty. *Id.*

On September 25, 2012, Dr. Dumitrescu noted that while Lilian T. was "tolerating" methotrexate, her rheumatoid arthritis could not be controlled. *Id.* at 522. By this point, Lilian T. reported shoulder pain and morning stiffness, and she could not make a fist or open cans. *Id.* Dr. Dumitrescu noted that Lilian T.'s fingers were deformed and their motion was abnormal; she also noted swelling, tenderness, and abnormal motion of Lilian T.'s hands, wrists, shoulders, knee, and ankles. *Id.* at 523.

On October 2, 2012, Lilian T. reported that her symptoms had largely continued, including ankle pain and swelling and decreased range of motion. *Id.* at 518. Her arthritis was still uncontrolled. *Id.* The doctor administered a steroid injection to Lilian T.'s ankle. *Id.* at 520. Lilian T. indicated during this visit that she wanted to participate in another clinical trial for her arthritis. *Id.*

On November 27, 2012, Lilian T. described continuing morning stiffness, as well as wrist and hand pain and swelling, deformity of her shoulder, and an abnormal range of motion in both her wrists and shoulders. *Id.* at 513. Her arthritis continued to be uncontrolled. *Id.*

By December 27, 2012, Lilian T.'s condition was still not controlled, according to Dr. Dumitrescu. *Id.* at 391. Lilian T. reported, however, that her pain and swelling improved with the steroid injections. *Id.*

On January 3, 2013, Lilian T. was still experiencing joint pain in her ankle, foot, hand, and shoulders. *Id.* at 420. She received an Enbrel injection and continued to receive Enbrel injections once per week for the rest of the month. *Id.* at 409–17. During this time, she continued to experience persistent joint pain and stiffness. *Id.*

On May 16, 2013, Dr. Dumitrescu wrote that Lilian T. had had only a "partial response" to Cimzia and that she had "failed Enbrel." *Id.* at 388. Methotrexate was producing only a "mild response." *Id.* The doctor noted tenderness on palpitation of Lilian T.'s fingers, hands, shoulder, and knee. *Id.* at 389. She also noted abnormal motion of Lilian T.'s fingers, hands, and knee. *Id.* Dr. Dumitrescu again referred Lilian T. for clinical studies. *Id.*

On December 19, 2013, Lilian T. reported experiencing neck and upper right shoulder pain for the past week. *Id.* at 469. The pain was not related to exertion or cardiovascular symptoms. *Id.* Lilian T. had a good range of motion in her right shoulder, but moving the joint was uncomfortable. *Id.* at 470. The doctor noted that she was enrolled in a clinical trial, but also prescribed a new medication, Naproxen. *Id.*

On September 4, 2014, Lilian T. enrolled in another clinical trial, this time for Baricitinib. *Id.* at 386. She had a "good response" and Dr. Dumitrescu noted limited tenderness, swelling, or abnormal motion of Lilian T.'s joints. *Id.* at 386–87. At the same time, Lilian T. reported continuing polyarthralgia and morning stiffness for more than 30 minutes each day. *Id.*

On November 17, 2014, Lilian T. began to experience abdominal pain, which the doctor noted were likely small rheumatoid nodules. *Id.* at 455. The pain was reportedly worse when she

laid down and got progressively worse during the day. *Id.* The doctor assessed that a CT scan might be necessary, given the location of her pain. *Id.*

On April 2, 2015, Lilian T. was reportedly doing "very well" on methotrexate and in the clinical trial. *Id.* at 556. She was starting to feel better and stated that she had begun going to the gym. *Id.* Dr. Dumitrescu did not note any swelling, tenderness, or deformity, or abnormal motion of any joints. *Id.* at 557.

By May 12, 2015, Lilian T. had again started to experience polyarthralgia in multiple small and large joints. *Id.* at 562.

On June 26, 2015, Lilian T. was "[n]ot doing well" and her dosage of methotrexate was increased. *Id.* at 627.

On July 30, 2015, Dr. Dumitrescu wrote that Lilian T. had been doing well on methotrexate and the clinical studies, but that her condition seemed to have deteriorated over the past few weeks. *Id.* at 569. In addition to experiencing polyarthralgia, Lilian T. presented with shoulder bursitis on her right side. *Id.* at 568. She was released from the clinical studies. *Id.* at 569. Her rheumatoid arthritis was described as "active," and the doctor decided to try treating her with Humira. *Id.* at 571. She was also prescribed an oral steroid. *Id.* at 569.

Lilian T. started taking Humira on August 20, 2015, *id.* at 621–23, but she did not feel that it helped. *Id.* at 586.

On October 27, 2015, she continued to have a decreased range of motion of the shoulders and received another steroid prescription to address her symptoms. *Id.* at 588.

On December 9, 2015, Lilian T. complained of polyarthralgia involving large and small joints, which she had been experiencing for over six months. *Id.* at 595.

On December 23, 2015, she again attended a follow-up appointment at which she described the same symptoms. *Id.* at 604. She described bilateral pain in her hands and estimated that the severity was about 6/10. *Id.* Dr. Dumitrescu noted 1+ synovitis in her hands and a decreased range of motion in her shoulders. *Id.* at 605.

On October 2, 2020, Dr. Erik Beger completed a Residual Functional Capacity Questionnaire on Lilian T.'s behalf. *Id.* at 1459. He found that she experienced joint pain, stiffness, swelling, and fatigue that significantly impacted her functional capacity. *Id.* More specifically, he noted that Lilian T. experienced fatigue, joint tenderness, reduced grip strength, spasms, atrophy, joint redness, joint swelling, and weakness, among other symptoms. *Id.* at 1459. These symptoms were supported by abnormal x-ray and lab results. *Id.* He specifically found that Lilian T. was not a malingerer and that her symptoms and functional limitations were not impacted by emotional factors or psychological conditions. *Id.* at 1460. Dr. Beger assessed that Lilian T. was incapable of even "low stress" jobs, and that he expected her pain or symptoms to interfere with her ability to work "constantly." *Id.* Dr. Beger estimated that Lilian T. could not sit for more than 20 minutes at a time and that she could not walk longer than one block. *Id.* at 1460–61. He stated that Lilian T. had significant limitations with repetitive reaching, handling, or fingering, and that she could not perform tasks such as twisting, stooping, crouching, climbing, or lifting objects over 10 pounds. *Id.* at 1461–62.

On October 27, 2020, Dr. Alan Fine, an obstetrician and State Agency reviewer, found that Lilian T. had two medically determinable impairments: rheumatoid arthritis and obesity. *Id.* at 69. However, he found that although Lilian T.'s medical records revealed that she experienced tenderness and abnormal motion of several joints on May 16, 2013, there was "absolutely no indication of tenderness at any joint tested, no abnormal motion of any of the joints tested and no

swelling of any joint" at her next exam on September 14, 2014. *Id.* Dr. Fine therefore found a "complete lack of any objective medical evidence" that Lilian T.'s joint tenderness or abnormal motion prevented her from working during the relevant time period. *Id.*

On January 17, 2021, Dr. Steve McKee, an emergency medicine doctor and State Agency reviewer, found that Lilian T. had no medically determinable impairments. *Id.* at 75–76. He appears to have adopted Dr. Fine's assessment wholesale and did not make any independent findings or statements of fact, except to note that Lilian T. was not alleging that her condition had worsened since Dr. Fine's assessment. *Id.* Dr. McKee ultimately concluded that because Lilian T. had no medical impairment, it was unnecessary to consider or evaluate her symptoms to determine severity. *Id.*

**2.    Disability Application**

On August 20, 2020, Lilian T. applied for DIB. Tr. at 221–27.

On October 27, 2020, her application was denied. *Id.* at 67–71.

On November 23, 2020, Lilian T. submitted a Request for Reconsideration. *Id.* at 89.

On January 17, 2021, Lilian T.'s Request for Reconsideration was denied. *Id.* at 73–76.

On February 8, 2021, Lilian T. requested a hearing. *Id.* at 95.

On June 16, 2021, the hearing was held before ALJ Harrington. *Id.* at 33–66. Lilian T. testified, through an interpreter, that prior to December 31, 2014, her hands hurt and she struggled to hold objects without dropping them. *Id.* at 43. Her wrists, hands, left foot, and left knee would swell and she could not walk. *Id.* She described her pain during that period as around 7 or 8 on a scale of 10 (10 being the worst pain imaginable). *Id.* at 44. She took Tylenol and steroids to manage her pain. *Id.*

Lilian T. also described that she struggled to sleep because of her stiffness. *Id.* at 44–45. She had trouble bathing on her own and relied on her husband to help her with most tasks. *Id.* Lilian T.'s right wrist, hand, and fingers were more painful than her left wrist, hand, and fingers, so she would use her left hand to do tasks, even though she is right-handed. *Id.* She estimated that she could only use her right hand to eat or do a similar task for about 10 minutes, and even that was "very difficult." *Id.* at 48. She experienced severe fatigue and malaise, which she described as "kind of like depression." *Id.* at 51. She remarked further that "[she] was suffering all day." *Id.* Although Lilian T. had her driver's license, she reported that she did not drive during the relevant period and relied on her husband to transport her when necessary. *Id.* at 56–57.

During this time, her symptoms were variable and she described that her pain and her ability to do tasks were uneven—some days were good days, while others were bad. *Id.* at 50. Throughout, though, Lilian T. stated that she could not sit or stand or be in any one position for an extended time, which she believed would limit her ability to work. *Id.* at 52–53. She also stated that her pain and discomfort disrupted her focus, such that she was unable to concentrate. *Id.* at 53.

Finally, Lilian T. testified that she graduated from a two-year medical office program at Norwalk Community College in December 2013. *Id.* at 54. She also worked as a nanny for two small children "for a short period of time" but her "condition did not allow [her] to continue." *Id.* at 55.

### 3.    ALJ Decision

On June 28, 2021, ALJ Harrington issued a decision denying Lilian T. disability insurance benefits. Tr. at 15–21.

9

At Step One of the sequential evaluation, ALJ Harrington found that Lilian T. last met the insured status requirements of the Social Security Act on December 31, 2014. Tr. at 18. The ALJ further found that Lilian T. did not engage in substantial gainful activity during the period after her alleged onset date (May 16, 2013) and before her DLI (December 31, 2014).[2] *Id.*

At Step Two, the ALJ found that prior to her DLI, Lilian T. had two medically determinable impairments that could reasonably be expected to produce the claimant's symptoms: rheumatoid arthritis and obesity. *Id.* at 18–19. ALJ Harrington determined, however, that Lilian T.'s "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent." *Id.* at 19.

B.  Procedural History

On May 9, 2022, Lilian T. filed this appeal. Compl., ECF No. 1.

On September 6, 2022, Lilian T. moved to reverse the decision of the Commissioner. Pl.'s Mot. for Order Reversing the Decision of the Comm'r or in the Alternative Mot. for Remand for a Hrg., ECF No. 12 ("Pl. Mot."); Pl. Mem.; Pl.'s Medical Chronology, ECF No. 12-2 ("Pl. Med. Chron.").

On November 4, 2022, the Commissioner moved to affirm the decision. Def.'s Mot. for an Order Confirming the Decision of the Comm'r, ECF No. 15; Mem. of L. in Support of the Def.'s Mot. for an Order Affirming the Decision of the Comm'r, ECF No. 15-1 ("Def. Mem."); Def.'s Responsive Statement of Facts, ECF No. 15-2 ("Def. Facts").

---

[2] The ALJ noted that the record reflects that, during this period, Lilian T. worked briefly as a part-time nanny. ALJ Harrington determined, however, that "this work activity did not rise to the level of substantial gainful activity." Tr. at 18. Accordingly, the ALJ proceeded to Step Two of the analysis.

## II.     STANDARD OF REVIEW

To be eligible for disability insurance benefits under the Social Security Act, an applicant generally must be "insured for disability insurance benefits." *See* U.S.C. §§ 423(a)(1)(A), 423(c)(1); *see also* C.F.R. §§ 404.130, 404.315(a). Those applicants who, like Lilian T., apply for benefits after they have ceased working must demonstrate that they experienced a "continuous period . . . during which [they were] under a disability" that commenced while the applicant was fully insured. 42 U.S.C. §§ 416(i)(2)(A), 416(i)(2)(C); 20 C.F.R. §§ 404.320(a). In other words, such claimants must demonstrate that they were disabled prior to the last date upon which they met the insured status requirements of the Social Security Act (also known as their DLI).

When deciding a disability insurance case, an ALJ must therefore determine whether the claimant became disabled prior to their DLI. The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). This determination is made through a five-step evaluation.

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(b). If they are not engaged in such activity, the ALJ must proceed to Step Two to determine whether the claimant has a severe medically determinable impairment or combination of impairments. *Id.* § 404.1520(c). An impairment will be considered severe if it significantly limits a claimant's ability to perform "basic work activities." *Id.* If the claimant has a medically determinable severe impairment, the ALJ proceeds to Step Three to determine whether any identified severe impairments meet or medically equal those identified in Appendix

11

1. *Id.* § 404.1520(d). These impairments are *per se* disabling, assuming a claimant meets the duration requirement. *Id.* If the claimant's impairments are not *per se* disabling, then the ALJ proceeds to Step Four, which entails assessing the claimant's residual functional capacity, or their ability to work in light of their limitations. *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e), 404.1545(a)(1). At Step Five, the ALJ must establish whether the claimant's residual functional capacity will allow the performance of any past relevant work. If the claimant is unable to perform past relevant work, the ALJ bears the burden of proving that, accounting for the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other work that exists in significant numbers in the national economy. *Id.* § 404.1520(g)(1). If the ALJ proves all of that, then the claimant is not disabled. *Id.*

The claimant bears the burden of proving the requirements of Steps One through Four, after which the burden shifts to the Agency to prove that the claimant is capable of working. *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("The burden is on the claimant to prove that he is disabled within the meaning of the Act. . . . However, if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the Secretary to show there is other gainful work in the national economy which the claimant could perform.").

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal

standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). It is generally "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). On the other hand, "[a]n ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). A court generally need not remand a case if the ALJ only committed harmless error, such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

**III.    DISCUSSION**

Lilian T. argues that ALJ Harrington erred in their analysis at Step Two, by determining that she did not have a severe impairment or combination of impairments prior to her DLI. Pl. Mem. at 7–8. More specifically, Lilian T. argues that the ALJ: (1) failed to evaluate medical treatment notes and retroactive medical opinions from beyond the relevant period and (2) improperly relied exclusively on the opinions of the two State Agency Reviewers. *Id.* at 8–14.

The Court addresses each of these arguments below.

A.    The Relevant Records

Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. *Echevarria v. Sec. of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982). This involves developing the claimant's complete medical history, including reviewing all evidence submitted by the claimant and assisting the claimant in obtaining medical evidence where necessary. *See* 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history . . . . We will make every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports.").

This evidence may extend beyond the relevant period, defined as the time period between the alleged date of onset of the claimant's disability and before their DLI. While a dearth of medical evidence from the relevant time period may "seriously undermine[]" a claimant's contention that they were disabled during that period, it is possible for a claimant to satisfy their burden of demonstrating that they were continuously disabled during the relevant period by means of evidence from only before and after that period. *Arnone v. Bowen*, 882 F.2d 34, 39 (2d

Cir. 1989) ("[W]e are not persuaded that the dearth of contemporaneous evidence *necessarily* precludes [the claimant's] entitlement to a 'period of disability'") (emphasis in original).

In order to be relevant to the ALJ's determination, evidence predating the alleged date of onset generally must demonstrate that a claimant's condition was not expected to improve in the future, while evidence postdating the DLI would be expected to show that the claimant's condition after the DLI had remained substantially the same as it had been during the relevant period. *Id.* In other words, medical evidence post-dating a claimant's DLI is relevant only to the extent that it bears on the condition of the claimant during the relevant period. *See Burch v. Comm'r of Soc. Sec.*, 1:15-cv-9350 (GHW), 2017 WL 1184294, at *16 (S.D.N.Y. Mar. 29, 2017) (considering the claimant's medical evidence post-dating her DLI only to the extent that it bore upon her condition during the relevant period); *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 301–03 (S.D.N.Y. 2014) (holding that it was proper for the ALJ To disregard a doctor's assessment of the claimant's condition that was applicable only to a period after the claimant's DLI); *Papp* v. *Comm'r of Soc. Sec.*, 05 Civ. 5695, 2006 WL 1000397, at *15 (S.D.N.Y. Apr. 18, 2006) (finding irrelevant all reports prepared by the doctor well after the claimant's DLI, which described the claimant's symptoms only as of those dates); *Dailey v. Barnhart*, 277 F. Supp. 2d 226, 233 n.14 (W.D.N.Y. 2003) ("Medical opinions given after the date that [the claimant's] insured status expired are taken into consideration if such opinions are relevant to her condition prior to that date")).

Lilian T. provided ALJ Harrington with medical treatment notes spanning from 2009 to 2021, as well as an arthritis residual functional capacity questionnaire completed by Dr. Erik

Beger on October 2, 2020.[3] Tr. at 341–2386. She initially alleged that her disability began on December 31, 2009, but amended the alleged onset date to May 16, 2013 at her hearing. *Id.* at 341. In their analysis, however, ALJ Harrington considered only those medical records from before Lilian T.'s DLI (December 31, 2014). *Id.* at 18–21. The ALJ therefore excluded both Lilian T.'s medical records from after December 31, 2014, and Dr. Beger's assessment. ALJ Harrington found that the post-DLI records did not pertain to the relevant period, and thus were "not probative." Tr. at 20. Additionally, the ALJ disregarded Dr. Beger's assessment because he did not begin treating Lilian T. until more than a year after her DLI and because the assessment pertained to periods beyond the relevant period. *Id.* at 20–21.

Lilian T. argues that the ALJ erred in considering only a fraction of her medical records. She characterizes the treatment notes from appointments after her DLI, as part of a "longitudinal record" that extends from the pre-DLI period to several months post-DLI. Pl. Mem. at 11, 14. Citing several cases from this Circuit, Lilian T. also argues that an ALJ's duty to develop the record includes a duty to obtain information from physicians who can provide retrospective opinions about a claimant, even if those physicians did not treat a claimant during the relevant time. *Id.* As a result, she claims that Dr. Beger's assessment should have been considered by ALJ Harrington because "a retrospective opinion from a treating specialist like Dr. Beger has a lot of probative value." *Id.* at 12.

The Commissioner responds that disregarding both the medical treatment notes from outside the relevant period and Dr. Beger's assessment was appropriate because neither pertained

---

[3] Some of the medical records in the administrative record—those marked Exhibit 27F, Tr. at 2336-86—were submitted by Lilian T.'s representative after the scheduled hearing. Tr. at 15–16. The ALJ used their discretion to find "good cause to admit the evidence[.]" Tr. at 16. The full administrative record therefore includes all of these medical records.

to the relevant time period. Def. Mem. at 11. The Commissioner further notes that Dr. Beger

wrote in his statement that "the earliest date these limitations existed was 2016" and that the

doctor did not treat Lilian T. until February 2016, nor is there any evidence that he reviewed any

of her medical records from the relevant time period. *Id.* For these reasons, the Commissioner

argues that the ALJ's conclusion that Dr. Beger's opinion was not persuasive was supported by

substantial evidence.

      The Court agrees with Lilian T. as to the medical records from after her DLI; the Court

agrees mostly with the Commissioner as to Dr. Beger's assessment.

### 1. The Post-DLI Records

      Lilian T.'s rheumatoid arthritis is clearly a long-term, ongoing condition for which she

has produced records from before, during, and after the relevant period. The records from the

relevant period are relatively thin, consisting only of four treatment notes. Pl. Med. Chron. ¶¶

14–18. Lilian T. argues that her participation in the Baricitinib clinical trial throughout that time

explains the relative scarcity of treatment notes, since it "meant that she received her care for

Rheumatoid Arthritis primarily through the Eli Lilly and Company research facility, meaning

that she does not have medical records of those visits." Pl. Mem. at 10.

      The few existing records are notes from occasional appointments with her regular doctors

during that time. Also, Lilian T. has provided records from before her alleged onset date that

describe her rheumatoid arthritis as "not controlled" and describe the failures of various

treatment options to mitigate her symptoms. *See* Tr. at 391–95; 512–13; 522–23. Likewise, she

has provided records from after her DLI describing persistent symptoms and additional

treatments. *Id.* at 562, 627.

In response, the Commissioner argues that Lilian T. has the burden of proving her disability, and that her participation in a clinical trial does not excuse her from this burden. Def. Mem. at 8. Moreover, the absence of records from this time, he argues, "supports the ALJ's finding that she had no severe impairments during the relevant period." *Id.* at 8.

The Court disagrees.

The Commissioner cites *Mauro v. Comm'r of Soc. Sec. Admin.* to support his contention that medical treatment notes from outside of the relevant period are categorically irrelevant. 746 Fed. App'x 83, 84 (2d Cir. 2019). The comparison to *Mauro*, however, is inapposite. There, Ms. Mauro failed to seek any treatment for her breast cancer before her DLI. *Id.* On appeal to the district court, Ms. Mauro sought to introduce new evidence, in the form of additional letters from doctors stating that she had cancer before her DLI. *Id.* The court there concluded that the new evidence did not warrant remanding the case to the ALJ because it was not material (it did not address whether Ms. Mauro's cancer rendered her unable to work before her DLI). *Id.* The case therefore does not stand for the proposition that evidence from after a claimant's DLI is *per se* irrelevant to the ALJ's determination. Moreover, in this case, Lilian T. introduced the records in question at her administrative hearing and does not seek to introduce any additional evidence here that was not presented to ALJ Harrington.

The Commissioner also emphasizes that Lilian T. has the burden of proving her disability and cites several cases in which the lack of evidence from the relevant period supports a finding of no severe impairment. *See Talavera v. Astrue*, 697 F.3d 145 (2d Cir. 2012); *Lau v. Comm'r of Soc. Sec. Admin.*, 787 Fed. App'x 59 (2d Cir. 2019) (summary order); *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). But in *Talavera*, the claimant had provided evidence of a number of medical examinations from the relevant period and none reported that she suffered from mental

impairments that would materially limit her ability to cope with the challenges of ordinary life. *Talavera*, 697 F.3d at 152–53 (upholding the ALJ's denial because "Talavera's cognitive faculties had been examined by a number of medical professionals [during the relevant period] and none reported that she suffered from material impairments" that would impact her daily functioning.). And in *Lau*, the claimant provided only records from several years after his DLI and included no evidence at all that his alleged disability was disabling during the relevant period. *Lau*, 787 Fed. App'x at 60 (finding that the ALJ's denial was supported by substantial evidence because Lau had provided only records from psychiatrists who treated him from 2015 onward, despite a DLI in 2014). Finally, for purposes of this case, *Burgess* only supports the notion that the claimant has the burden of proof at the first four steps of the sequential evaluation, a legal standard that Lilian T. does not dispute. *Burgess*, 537 F.3d at 128 ("The claimant has the general burden of proving that he or she has a disability within the meaning of the Act").

Here, Lilian T. has provided some medical records from the relevant period, and she has provided a reasonable explanation—the clinical trial—for any potential gaps. She has also offered her testimony from the hearing, which is consistent with the records. Pl. Mem. at 11. Finally, Lilian T. refers to records from before and after the relevant period to illustrate a broader narrative of her condition throughout the relevant time period. Before her alleged date of onset, Lilian T.'s doctor described her rheumatoid arthritis as "not controlled." Tr. at 391–95; 512–13; 522–23. Records from that time reveal that Lilian T. had tried a number of different treatments for her condition, none of which had succeeded. *See, e.g.*, *id.* at 388–95 (Describing Lilian T.'s rheumatoid arthritis as uncontrolled and noting that she had only a "partial response to

[C]imzia[,]" had "failed Enbrel[,]" and was merely "tolerating" methotrexate.). This necessitated her enrolling in several clinical trials. *Id.* at 390.

The records also suggest that, while some of the treatments seemed to mitigate her symptoms for short periods of time, no treatment brought her rheumatoid arthritis under control. Although, as the ALJ points out, Lilian T. responded well to Baricitinib on September 4, 2014, by November of that same year, she had begun to experience severe abdominal pain due to rheumatoid nodules. Tr. at 455–56 (Lilian T. complained of "new pain in lower abdomen," diagnosed as "likely" small rheumatoid nodules). And, by the spring of 2015, her condition had deteriorated. Tr. at 562, 627 (By May 12, 2015, Lilian T. had "started to experience polyarthralgia involving small joints as well as large joints" and by June 26, 2015, she was "[n]ot doing well."). Overall, Lilian T.'s medical records suggest an inability of five to ten different medications and treatment regimens to control her rheumatoid arthritis. The ALJ did not address this broader trend when making their determination.

Accordingly, Lilian T.'s records from after her DLI should not, as a matter of law, have been excluded from consideration by ALJ Harrington. These records, consistent with the discussion above, are relevant to Lilian T.'s condition during the operative period and should have been considered when determining whether Lilian T. was severely disabled prior to her DLI.[4]

---

[4] The Court also notes that the parties dispute the meaning of a treatment note from May 12, 2015. Lilian T. argues that the note confirms that after her DLI, her physical exams continued to demonstrate "tenderness and deformity in her hands, wrists, elbows, knees, ankles, and feet, with abnormal motion in all of those body parts except her hands[.]" Pl. Mem. at 11, citing Tr. at 563. The Commissioner asserts that "the treatment note in question actually shows no swelling, tenderness, deformity, or abnormal motion of her hands, wrists, elbows, shoulders, hips, knees, ankles, and feet[.]" Def. Mem. at 7. As described above, where the record is unclear or the clinical findings are inadequate, an ALJ has an affirmative duty to seek additional information. *Messina v. Comm'r of Soc. Sec. Admin.n*, 747 Fed. App'x 11, 16 (2d Cir. 2018) ("[I]f the ALJ found [the doctor's] report unclear or had questions about the bases for [their] conclusions, he had an affirmative duty to seek such additional information[.]"); *Rivers v. Kijakazi*, 21-1935-cv, 2023 WL 2485467 (2d Cir. Mar. 14, 2023) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)

### 2.  Dr. Beger's Assessment

Because Dr. Beger did not begin treating Lilian T. until February 2016, more than a year after her DLI, his assessment of her residual functional capacity is of limited value in determining whether she was disabled during the relevant period. *Id.* at 1460–62. Moreover, the assessment contains the question: "What is the earliest date that the above description of limitations applies?" to which Dr. Beger replied, "2016." *Id.* at 1459. While Dr. Beger's medical opinion in this questionnaire is therefore clearly retroactive, he explicitly limited its applicability to a period well after the relevant period. *Id.*; Tr. at 21. As a result, ALJ Harrington correctly disregarded Dr. Beger's assessment of Lilian T.'s functional limitations as not probative. Tr. at 21.

However, some of Dr. Beger's other assessments—ones that were unlikely to have changed between the relevant period and the assessment date—may have been probative and should have been considered by the ALJ. More specifically, the ALJ should have considered Dr. Beger's assessment that Lilian T. is not a malingerer and that her symptoms (including pain) and functional limitations were not impacted by emotional factors. *Id.* at 1460; *see also Joshua T v. Comm'r of Soc. Sec.*, 19-CV-1355S, 2021 WL 1099614, at *4 (W.D.N.Y. Mar. 23, 2021) ("Medical records indicating doctors' suspicions of malingering are properly considered by ALJs in making their credibility determinations."), *Bruno v. Colvin*, No. 2:15-CV-163, 2016 WL 3661243, at *3 (D. Vt. July 5, 2016) (finding it appropriate for the ALJ to consider malingering in assessing a claimant's credibility where the treating physicians noted potential malingering "due to vagueness and volume of s[ymptom]s,"); *Evans v. Colvin*, 649 Fed. App'x 35, 39–40 (2d

---

("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history")). As a result, to the extent that the ALJ considers this treatment note in re-assessing Lilian T.'s claim, the ALJ is directed to seek additional information regarding the meaning of the doctor's statements.

Cir. 2016) (holding that an ALJ's determination that a claimant's complaints of pain were not credible was unreasonable in light of record evidence that her treating physicians "seemed intent on treating [her] condition and relieving her pain" and that "not one of them suggested that [she] was exaggerating her symptoms."); *Drake v. Saul*, 839 Fed. App'x 584, 588 (2d Cir. 2020) (finding that a doctor's note stating that there was "no evidence for [the claimant] to be 'faking bad' or 'malingering' supported a finding that the claimant was credible"). These qualities, unlike specific symptoms or physical limitations, were unlikely to have changed between the relevant period and the date of assessment. Moreover, such assessments, if considered, would have been helpful in assessing the credibility of Lilian T.'s testimony about her subjective symptoms, including pain.[5] *See Campbell v. Astrue*, 465 Fed. App'x 4, 7 (2d Cir. 2012) ("[T]he ALJ must . . . consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with . . . other evidence of record") (internal punctuation omitted) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

    B.  <u>Evaluating the Relative Weight of Various Medical Records</u>

       The regulations regarding the evaluation of various medical opinions were amended for claims filed after March 27, 2017, and the "Treating Physician Rule"[6] no longer applies. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867–68

---

[5] ALJs are "required to take the claimant's reports of pain and other limitations into account," 20 C.F.R. § 416.929, but they are "not require[d] to accept the claimant's subjective complaints without question," *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Rather, they may exercise discretion by weighing a claimant's testimony against other evidence in the record, including the opinion of the claimant's treating physician. *Campbell v. Astrue*, 465 Fed. App'x 4, 7 (2d Cir. 2012) (quoting *Genier*, 606 F.3d at 49).

[6] The "Treating Physician Rule" gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

(Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. Lilian T's application, which was filed on August 20, 2020, is subject to the new regulations. Tr. at 222–27.

Under the new regulations, "the Commissioner 'will not defer or give any specific evidentiary weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources.'" *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7 (W.D.N.Y. 2021) (quoting 20 C.F.R. § 404.1520c(a)). Instead, in considering various medical opinions, the Commissioner is required to consider factors including "(1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, purpose and extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) any other factors that 'tend to support or contradict a medical opinion or prior administrative medical finding.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(c), 416.920c(c)).

Although the ALJ is no longer required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* (alterations in original) (citation and internal quotation marks omitted). While the ALJ is not required to specifically discuss each of the factors, the ALJ must expressly consider "the supportability and consistency factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[S]upportability . . . and consistency . . . are the most important factors . . . [and] [t]herefore, [the ALJ] will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination."); *see also Vellone ex rel. Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical

opinion."), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).

For the supportability factor, "[t]he more relevant the objective medical evidence and supporting

explanations presented by a medical source are to support his or her medical opinion(s) . . . , the

more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(1),

416.920c(c)(1). For the consistency analysis, "[t]he more consistent a medical opinion(s) . . . is

with the evidence from other medical sources and nonmedical sources in the claim, the more

persuasive the medical opinion(s) . . . will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

Indeed, "despite the new regulations, an ALJ's duty to develop the record takes on

heightened importance with respect to a claimant's treating medical sources, because those

sources are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or from

reports of individual examinations." *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 583 (S.D.N.Y.

2022) (citation and internal quotation marks omitted).

Lilian T. argues that, considering these standards, the ALJ erred in relying "exclusively"

on the assessment of Drs. Fine and McKee. She points to several factors, which, she argues,

indicate that the ALJ should have assigned less weight to these assessments. First, neither

Agency Reviewer was a rheumatologist or internist: Dr. McKee is an emergency room specialist

and Dr. Fine is an obstetrician. Pl. Mem. at 13. Second, Drs. Fine and McKee reviewed only a

few treatment notes from her records.[7] *Id*. Third, the two assessments were fundamentally

inconsistent with each other, since Dr. Fine found that Lilian T. had two medically determinable

---

[7] The Court notes that Lilian T. claims that Drs. McKee and Fine reviewed only two treatment notes. Pl. Mem. at 13.
The record reflects, however, that they each reviewed four, although two were from doctor's visits before her
amended alleged onset date. Tr. at 67–76.

impairments, although neither was severe, while Dr. McKee found that she had no medically determinable impairments at all. *Id.* at 21.

In response, the Commissioner argues that the ALJ properly considered both supportability and consistency when assessing the assessments of Drs. Fine and McKee. Their findings, the Commissioner argued, were consistent with clinical findings from the relevant period, as well as the evidence that Lilian T. worked as a nanny and completed college coursework during that time. Tr. at 20–21. Moreover, the Commissioner contends that any discrepancy between Dr. McKee's assessment that Lilian T. had no medically determinable impairments and Dr. Fine's assessment that she had two are "distinctions without a difference." Def. Mem. at 11 n.5. The relevant consideration, the Commissioner argues, is that both doctors agreed that Lilian T. had no severe medically determinable impairments during the relevant time period. *Id.* Based on these factors, the Commissioner therefore argues that the ALJ assigned proper weight to the Agency Reviewer assessments.

The Court disagrees.

As described above, consistency and supportability are the two most important factors when determining how to weigh various medical opinions. The question of whether or not Lilian T. had a medically determinable impairment at all during the relevant period is foundational to the determination of whether she was disabled. *See Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("To be found eligible for disability insurance benefits, an applicant must show that he is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]'" (quoting 42 U.S.C. § 423(d))). This obvious and material discrepancy between the two assessments—one stating that Lilian T. had two medically determinable impairments and one stating that she had none—should have prompted the ALJ to

either rely more heavily on other doctors' notes in the record, or to seek out additional information or another assessment. *See Almonte v. Comm'r of Soc. Sec.*, No. 21-cv-3091 (PKC), 2022 WL 4451042, at *5 (E.D.N.Y. Sept. 23, 2022) ("As part of [the] obligation to develop the record, an ALJ must attempt to obtain medical opinions—not just medical records—from a claimant's treating physicians. That obligation continues to exist even in cases involving claims filed after March 27, 2017, to which the 'treating physician rule' no longer applies." (citation omitted)) (citing *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *10–11 (S.D.N.Y. Aug. 6, 2021)); *see also Rosa*, 168 F.3d at 79 (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in [the medical record], the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly")).

Accordingly, the Court holds that ALJ Harrington gave improper weight to the assessments of Drs. Fine and McKee.

## C. Effects on the Severity Determination

At Step Two of the Sequential Evaluation process, the ALJ must determine whether the claimant's medically determinable impairment (or combination of impairments) is "severe." This is a threshold determination. Generally, if a claim rises above a baseline level, then the ALJ must undertake further analysis of Step Three and beyond. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Tulipani v. Saul*, 3:19-cv-565 (AVC), 2020 WL 13553266, at *14 (D. Conn. Apr. 13, 2020) (quoting *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. 1999) (referencing *Bowen v. Yuckert*, 482 U.S. 137, 154 n.12 (1987))).

The determination of whether a claimant's symptoms are severe is a two-step process. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 404.1529(c)(1). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. 20 C.F.R. § 1529(c)(3).

"The Second Circuit has warned that the step two analysis may not do more than screen out *de minimis* claims." *Flanigan*, 21 F. Supp. at 300 (quoting *Dixon*, 54 F.3d at 1030). Moreover, while an ALJ may weigh a claimant's subjective testimony against objective medical evidence and any other relevant factors, they must state the basis for rejecting a claimant's testimony with sufficient particularity to allow a reviewing court to determine whether the reasons for disbelief were legitimate and whether the determination is supported by substantial evidence. *Lori S.C. V. Comm'r of Soc. Sec.*, 3:22-cv-625 (AMN/DEP), 2023 WL 5089017, at *1 (N.D.N.Y. Aug. 9, 2023) (quoting *Martone v. Apfel*, 70 F. Supp. 2d 145, 151 (N.D.N.Y. 1999) ("An ALJ who rejects subjective testimony concerning pain and other symptoms must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence") (internal quotation marks excluded)).

Here, ALJ Harrington explains that Lilian T.'s testimony was unpersuasive because it was "not entirely consistent" with the medical records from before her DLI, the assessments of Drs. Fine and McKee, and the fact that she worked as a nanny and graduated from Norwalk Community College during the relevant period. Tr. at 20. The ALJ erred regarding the proper scope of medical records to be considered and the proper weight to be given to the opinions of

the State Agency Reviewers. In light of the applicable standard for a finding of severity at Step Two, the Court finds that these errors might very well have affected the disposition of the case. As such, and particularly in the absence of any meaningful analysis beyond Step Two, the errors cannot be considered harmless. *See Zabala v.* Astrue, 595 F.3d 402, 409 ("Remand is unnecessary, however, where application of the correct legal standard could lead only to one conclusion.") (citation and internal quotation marks omitted).

Accordingly, the Court reverses the ALJ's decision and remands the case for further proceedings consistent with this Ruling and Order.

## IV.    CONCLUSION

For the reasons explained above, Lilian T.'s motion is **GRANTED**. The Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of September, 2023.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge